PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No.  15-4064
_____

UNITED STATES OF AMERICA

v.

JOSEPH A. FERRIERO,
                    Appellant


_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 2-13-cr-00592-001)
District Judge: Honorable Esther Salas
_____

ARGUED:  November 1, 2016

Before: HARDIMAN and SCIRICA, *Circuit Judges*, and
ROSENTHAL,* *District Judge*.

_____

    * The Honorable Lee H. Rosenthal, United States
District Judge for the Southern District of Texas, sitting by
designation.

(Filed: August 4, 2017)

Peter Goldberger, Esq. [ARGUED]
50 Rittenhouse Place
Ardmore, PA  19003
   *Counsel for Appellant*

Mark E. Coyne, Esq.
Bruce P. Keller, Esq. [ARGUED]
970 Broad Street
Suite 700
Newark, NJ  07102
   *Counsel for Appellee*

————————————

OPINION OF THE COURT
————————————

SCIRICA, *Circuit Judge*.

Joseph A. Ferriero appeals his judgments of conviction, forfeiture, and sentence based on violations of the Travel Act, 18 U.S.C. § 1952, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *id.* § 1962(c), and the federal wire fraud statute, *id.* § 1343.  We will affirm.[1]

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

**I.**

Joseph Ferriero served as chairman of the Bergen County Democratic Organization (BCDO) from 1998 until he resigned in January 2009. As party chair, Ferriero wielded significant power in the process of nominating Democrats in local elections and in the process of choosing which issues and candidates the party supported. In his role, he raised money for the Democratic Party, helped elect Democratic candidates to local office, and managed campaigns in important local elections. Significantly for this case, one aspect of party business was connecting and recommending vendors to Democrats elected or appointed to local office in Bergen County.

Ferriero's convictions stem from payments he took from a particular vendor, John Carrino, in exchange for recommending to certain officials that their towns hire Carrino's firm. Carrino owned C3 Holdings, LLC (hereinafter, "C3")—short for Citizen Communications Center—a New Jersey corporation that provided emergency-notification systems for local governments.[2] Carrino also owned Braveside Capital, LLC, a New Jersey corporation he described as the "sales arm" of C3.

Since Carrino sought municipal contracts for C3, Ferriero was uniquely situated to influence Democratic

---

[2] Emergency-notification systems—also known as "reverse 911" services—allow governments to use various communication platforms (e.g., text message, email, voice call) to automatically notify residents of local emergencies like natural disasters, missing children, loose wild animals, and power outages.

municipal officials by virtue of his position as their county party chair.  The two struck an agreement.  Ferriero would recommend C3 to local governments in exchange for a 25- to 33-percent commission on contracts for the towns that ultimately hired the company.  They memorialized the agreement in a contract between Carrino's Braveside Capital and SJC Consulting, a new company Ferriero had incorporated under the laws of Nevada.  The contract, executed April 22, 2008, describes the relationship as an "agreement . . . to provide governmental relations consulting services required in connection with marketing of a product known as C3 and any other related products or services."

To that end, Ferriero had drawn up a list of target Bergen County municipalities with corresponding names of Democrats in local office, and over the course of about a year, he "pushed hard for C3."  Relevant to his convictions, he recommended C3 to local officials for the boroughs of Dumont, Cliffside Park, and Wood-Ridge, and for Saddle Brook and Teaneck townships.

Ferriero made these recommendations at BCDO-sponsored events, at local political fundraisers, at informal meetings, or simply over email.  For example, Ferriero made inroads for C3 with Dumont's leadership at a 2007 lunch where he introduced Carrino to the borough's mayor, Matthew McHale.  Ferriero recommended C3 to the mayor and followed up with an email asking, "How [are] we doing with C-3"?  Mayor McHale ultimately brought C3 to the borough administrator, who in turn took the idea to the borough council.  The borough council voted to license C3's software.  Neither McHale, the borough administrator, nor the

councilmembers knew Ferriero would make money as a result.

In August 2007, Ferriero introduced Carrino to Teaneck councilman El-Natan Rudolph, whose name Ferriero had written next to Teaneck on the list of municipal sales targets. Rudolph put Carrino in touch with Teaneck's town manager, Helene Fall, who that very day emailed Carrino about C3's web services. In December, the Teaneck council unanimously voted for a resolution, introduced by Rudolph, authorizing the town to pay up to $24,000 to hire C3 for the year 2008.

In November 2007, Ferriero introduced Carrino to Saddle Brook Mayor Louis D'Arminio at a BCDO-sponsored gala. Ferriero recommended C3's products, and D'Arminio and Carrino exchanged business cards. The town council ultimately voted to contract with C3 without D'Arminio or the township council having been aware that Ferriero stood to benefit financially from the contract.

Sometime in 2008, Ferriero called Cliffside Park's borough attorney Chris Diktas to vouch for C3 after Carrino pitched the service to town leaders. Councilwoman Dana Spoto testified that, before the borough council voted on the matter, Diktas advised her that Ferriero had vouched for C3 and that "Joe wanted it." The Cliffside Park council voted to contract with C3, resolving to authorize a $2,000-per-month contract, though neither Diktas nor Councilwoman Spoto were aware Ferriero stood to gain financially from the contract.

5

As Carrino's local contracts moved forward, Ferriero profited as well. Over the course of 2008, Carrino paid Ferriero's SJC Consulting at least $11,875 with checks that included those four town names in the checks' memo lines. On a check dated May 16, 2008, the memo line read "Q1/Q2 SB / Q1 Dumont." A check dated July 27, 2008, had a memo line that read "Q1: Teaneck Q2: Teaneck, Dumont + CP – Q2 (2m)." And the memo line of a check dated September 18, 2008, read "Q3: Saddlebrook & Dumont."

Sometime that same year, Cliffside Park's mayor grew concerned about Ferriero's role in the town's contract with C3. He asked the borough's Chief Financial Officer, Frank Berardo, about the contract's details and directed Berardo to find out "who the owners of the company were." On July 9, 2008, Berardo called Carrino to inquire into the contract and "the owners of th[e] corporation." Carrino said he would respond by email, and roughly one hour later, emailed Berardo with a reply:

> Frank,
>
> Per our conversation this morning, please find attached copies of the State of New Jersey Business Certificate as well as C3's Standard Software as a Service Licensing Agreement.
>
> Please call me if you have any questions. My cell is: [***.***.****]
>
> By way of this email I am also cc'ing [Borough Attorney Chris] Diktas for his review.

Attached to the email were copies of the contract and C3's certification of formation, which listed only Carrino under

"Members/Managers." There was no reference to Joseph Ferriero. Cliffside Park paid Carrino for services in June and July with a $4,000 check dated July 9.

Not all of the localities on Ferriero's list ultimately hired C3. The Borough of Wood-Ridge declined to contract with C3, but the borough's mayor Paul Sarlo still felt pressured to do so. Mayor Sarlo broke the news of Wood-Ridge's decision to Ferriero and Carrino at a local political fundraiser. Ferriero and Carrino were upset and the ensuing conversation "got tense and . . . heated" until a Sarlo staffer intervened.

Ferriero pushed Democratic officials from Bergen County towns to contract with C3, and four of the localities on his list eventually did so. He was paid thousands of dollars based on those four contracts in checks listing out which payments corresponded to which town. But none of the local Democratic officials to whom Ferriero recommended C3 were aware he stood to profit.

## II.

A federal grand jury returned a five-count Indictment that charged Ferriero with violations of RICO, the Travel Act, and federal mail and wire fraud statutes. Count 1 charged Ferriero with violating RICO, 18 U.S.C. § 1962(c), alleging he conducted the Bergen County Democratic Organization through a pattern of racketeering activity. As proof of that pattern, the Indictment alleged seven predicate racketeering acts. Racketeering acts #1 and #2 were based on allegations of bribery, extortion, and honest services fraud unrelated to

7

Ferriero's contract with C3.[3]  Predicate racketeering acts #3 through #7 alleged the payments made in exchange for Ferriero's recommendations to local Democratic officials in favor of contracting with C3 violated New Jersey's bribery statute.  That provision prohibits "accept[ing] or agree[ing] to accept . . . [a]ny benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, *party official* or voter on any public issue or in any public election."   N.J. Stat. Ann. § 2C:27–2 (emphasis added).

Count 2 charged Ferriero with conspiracy to commit mail fraud, 18 U.S.C. § 1341, wire fraud, *id.* § 1343, and violations of the Travel Act, *id.* § 1952.  Count 3 charged a substantive Travel Act violation based on an underlying violation of New Jersey's bribery statute.  Counts 4 and 5 charged violations of mail and wire fraud, respectively, alleging Carrino and Ferriero defrauded Dumont (Count 4) and Cliffside Park (Count 5).  Count 5's underlying fraud allegation stemmed from the Carrino email to Cliffside Park

---

[3] The jury found the government failed to prove racketeering acts #1 and #2.  Racketeering act #1 alleged Ferriero orchestrated the appointment of Dennis Oury as Bergenfield, NJ, borough attorney.  Ferriero allegedly committed bribery and honest services fraud when he gave Oury a financial interest in a Ferriero-owned grant-writing company called GGC in exchange for Oury's promise to arrange for Bergenfield to hire the firm.  Racketeering act #2 alleged Ferriero committed bribery and extortion when he and others accepted a $35,000-per-month consulting fee in exchange for supporting a commercial development project in the Bergen County town of East Rutherford.

that failed to disclose Ferriero's financial interest in the borough's contract with C3.

Before trial, Ferriero moved to dismiss Count 1 (RICO) on the ground the Indictment failed to allege RICO's so-called "nexus" requirement, and moved to dismiss Counts 1–3, arguing New Jersey's bribery statute was unconstitutionally overbroad and vague. Both motions were denied.

The jury found Ferriero guilty on Count 1 (RICO), Count 3 (Travel Act), and Count 5 (wire fraud). As noted, the jury determined that, for Count 1's seven alleged racketeering acts, the government did not prove Ferriero committed racketeering acts #1 and #2, the alleged crimes unrelated to the C3 scheme. *See supra*, note 3. But the jury concluded Ferriero committed racketeering acts #3 through #7—that is, the jury concluded Ferriero committed bribery by agreeing to recommend C3's services in exchange for a share of any resulting contracts' revenues. The jury acquitted Ferriero of Count 2 (conspiracy) and Count 4 (mail fraud).

Ferriero had moved for judgment of acquittal on all counts following the close of the government's case at trial, and he renewed that motion for Counts 1, 3, and 5, which the court denied. Ferriero was sentenced to three concurrent 35-month prison terms and ordered to forfeit the money equivalent of the proceeds he derived from the racketeering and wire fraud. Ferriero appealed.

### III.

### A.

Ferriero mounts three challenges on the sufficiency of the evidence supporting his convictions for violating RICO and the Travel Act.[4]

### 1.

Ferriero asserts the evidence was insufficient to prove New Jersey bribery as a predicate act for his Travel Act and RICO convictions.

The Travel Act prohibits using interstate travel, mail, or facilities with intent to carry out "any unlawful activity," 18 U.S.C. § 1952(a)(3), or with intent to "distribute the proceeds of any unlawful activity," *id.* § 1952(a)(1). The definition of "unlawful activity," includes "bribery . . . in violation of the laws of the State in which committed." *Id.* § 1952(b)(2). RICO proscribes participating in the conduct of an interstate enterprise's affairs "through a pattern of racketeering activity," *id.* § 1962(c), a term defined to include

---

[4] For challenges to the sufficiency of the evidence, we construe the evidence in favor of the government and reverse only if no rational juror could have found all essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010). To the extent Ferriero's sufficiency arguments raise issues of statutory interpretation, our review is plenary. *United States v. Parise*, 159 F.3d 790, 794 (3d Cir. 1998).

acts involving "bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year," *id.* § 1961(1)(A).

Ferriero's Travel Act and RICO convictions both rest on the jury's determination that, as a party official, he violated New Jersey's prohibition against "[b]ribery in official and political matters." N.J. Stat. Ann. § 2C:27–2. According to that provision, "[a] person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept . . . [a]ny benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election." *Id.*

The record contains sufficient evidence to support the jury's conclusion Ferriero violated New Jersey's bribery statute. He agreed to accept payments from John Carrino as consideration for a particular recommendation on a public issue—namely, his favorable recommendation to Democrats holding office in Bergen County on the public issue of whether their towns should contract to hire C3.

Ferriero asserts his conviction requires additional proof he agreed to "undermine the integrity of the towns' processes in considering whether to purchase the C3 product." Appellant Br. at 29. For this proposition he cites *United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976), a Travel Act case in which the alleged predicate "unlawful activity" was a violation of New Jersey's predecessor bribery statute that has since been repealed and superseded. *Dansker* held that a conviction under New Jersey's predecessor bribery statute required proof a defendant agreed to "undermine the

11

integrity of [a] public action." *Id.* at 49. Ferriero relies on *Dansker* to maintain the government must show an integrity-undermining intent to prove he violated New Jersey's current bribery statute.

*Dansker* involved several alleged bribes paid by real estate developers to the vice-chair of the Fort Lee, New Jersey parking authority. *Id.* at 44. The developers owned a large swath of property at the western terminus of the George Washington Bridge—property zoned for non-commercial use—and sought zoning variances in order to develop the property into a shopping center. *Id.* Nathan Serota, a nearby resident and the local parking authority's vice-chair, launched a public campaign against it, though he never acted in his capacity as a public official. *Id.* at 44–45. The developers paid Serota to drop the public campaign, which a jury concluded violated the Travel Act because the payments amounted to bribes in violation of New Jersey's then-existing bribery statute. *Id.* at 44. That statute included broad language prohibiting anyone—public officials or otherwise—from giving or accepting "any . . . thing of value . . . to procure any work, service, license, permission, approval or disapproval, or any other act or thing connected with or appertaining to any [governmental body]."[5] *Id.* at 48 (alteration in original).

---

[5] In full, the predecessor bribery statute at issue in *Dansker* read:

> Any person who directly or indirectly gives or receives, offers to give or receive, or promises to give or receive any money, real estate, service or thing of value as a bribe, present or reward to obtain, secure or procure any work,

We observed that the statute did not require a bribe recipient occupy a position of public trust, nor did it require a recipient "attempt to influence governmental action in an unlawful or otherwise corrupt manner." *Id.* Read literally, the statute's breadth risked running afoul of the First Amendment, and we construed the provision to reach "only that conduct which has been the traditional concern of the law of bribery—conduct which is intended, at least by the alleged briber, as an assault on the integrity of a public office or an official action." *Id.* We explained the gravamen of the offense was the recipient "agree[ing] to utilize whatever apparent influence he might possess to somehow corrupt a public office or an official act." *Id.* We did not read the statute as criminalizing public officials influencing governmental action in otherwise legal ways. *Id.* at 49. Rather, we said that to prove a violation of the statute as a federal predicate, the government must demonstrate:

> (a) that the alleged recipient, whether he be a public official or not, possessed at least the apparent ability to influence the particular public action involved; and (b) that he agreed to

---

> service, license, permission, approval or disapproval, or any other act or thing connected with or appertaining to any office or department of the government of the state or of any county, municipality or other political subdivision thereof, or of any public authority, is guilty of a misdemeanor.

N.J. Stat. Ann. 2A:93–6 (repealed 1978); *Dansker*, 537 F.2d at 48.

exert that influence in a manner which would
undermine the integrity of that public action.

*Id.* Because Serota, in his capacity as parking vice-chair, had
no actual or apparent ability to influence the official decisions
concerning the shopping center development, there was no
evidence that, in purchasing his support, the developers
corrupted the zoning board's decisionmaking process. *Id.* at
50.

Several years later, New Jersey repealed the statute at
issue in *Dansker*. As part of the state's comprehensive
reform of its criminal code, the legislature repealed the
predecessor bribery statute and enacted the current version,
*see* Act of Aug. 29, 1979, ch. 178, 1979 N.J. Laws 664, 712–
13 (codified at N.J. Stat. Ann. § 2C:27–2), which is more
narrow than the statute we construed in *Dansker*. The
predecessor statute applied to the universe of persons in New
Jersey, whereas the current statute's language is limited to
bribing persons in positions of public trust—that is, "a public
servant, party official or voter," N.J. Stat. Ann. § 2C:27–2—
and the current provision only prohibits bribing those persons
to secure a particular decision, opinion, recommendation, or
vote, *see id.*

Ferriero suggests we read into New Jersey's current
bribery provision *Dansker*'s language requiring an agreement
to undermine the integrity of a public action. But he does not
cite any cases in our court or New Jersey's courts reading that
requirement into the current provision. Ferriero cites several
cases that borrow *Dansker*'s language, Appellant Br. at 22–
23, but those cases do not involve the substantive application
of New Jersey bribery law. Rather, they employ *Dansker*'s

14

language to describe bribery generically. *See United States v. Forsythe*, 560 F.2d 1127, 1137 n.23 (3d Cir. 1977).

The importance of generic descriptions of crimes like bribery stems from federal enforcement schemes that incorporate state law. When a federal scheme incorporates state law, whether a state-law violation qualifies as a federal predicate depends on whether the state offense falls within that crime's generic definition.[6] *Id.* at 1137. In *United States v. Forsythe*, for example, we considered whether Pennsylvania's bribery statute qualified as a predicate for RICO, 18 U.S.C. § 1961(1)(A), which incorporates "act[s] . . . involving . . . bribery." *Id.* (alteration in original). Citing *Dansker*, we noted "[t]he generic description of bribery is 'conduct which is intended, at least by the alleged briber, as an assault on the integrity of a public office or an official action.'" *Id.* at 1137 n.23 (quoting *Dansker*, 537 F.2d at 48).[7]

---

[6] In *United States v. Nardello*, 393 U.S. 286, 287 (1968), for example, the Supreme Court considered whether Pennsylvania's law punishing "blackmail" could be used as a predicate for the Travel Act, which incorporates "'extortion' in violation of the laws of the State in which committed." The Supreme Court explained that even though Pennsylvania did not explicitly call the offense "extortion," it was still a valid Travel Act predicate because the conduct punishable as "blackmail" fell within extortion's generic definition. *Id.* at 296.

[7] We quoted the same language in later cases evaluating whether state bribery laws counted as federal predicates. *See Rose v. Bartle*, 871 F.2d 331, 362 (3d Cir. 1989); *United States v. Traitz*, 871 F.2d 368, 387 n.21 (3d Cir. 1989).

15

But there is sa difference between the elements of underlying state-law predicates and the definition of generic offenses enumerated in federal laws like RICO and the Travel Act. *Dansker* involved construing New Jersey's predecessor bribery statute for purposes of its substantive application, whereas *Forsythe* and subsequent cases merely borrowed *Dansker*'s language to define bribery in generic terms. Ferriero does not argue that New Jersey's current bribery statute falls outside the generic definition of bribery. Rather, he suggests we take the requirement the *Dansker* court read into the predecessor statute—that the government prove an agreement to undermine the integrity of a public action—and likewise read that requirement into the current provision as an additional, extra-textual element.

We decline to do so. We read the current statute as sufficiently distinguishable from the statute in *Dansker* that we need not extend *Dansker*'s limiting construction of the predecessor statute to the current one. For that reason, we see no basis for disturbing Ferriero's Travel Act and RICO convictions on sufficiency grounds.

**2.**

Next, Ferriero challenges his RICO conviction by attacking the sufficiency of the evidence supporting 18 U.S.C. § 1962(c)'s "nexus" element. Section 1962(c) makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Id.* The nexus element requires proving a sufficiently close relationship between the defendant, his involvement in the enterprise's affairs, and the pattern of racketeering. *See In re Ins. Brokerage Antitrust*

16

*Litig.*, 618 F.3d 300, 371 (3d Cir. 2010). This includes the relationship between the defendant and the conduct of the enterprise's affairs, *see Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993), and between those affairs and the predicate racketeering activity, *see Ins. Brokerage*, 618 F.3d at 371; *see also United States v. Cauble*, 706 F.2d 1322, 1331–33 (5th Cir. 1983) (discussing the relational permutations of the defendant, enterprise, and racketeering acts in § 1962(c)'s nexus element). The latter relationship, which Ferriero asserts was not proved here, proceeds from the requirement a defendant participate in the conduct of the enterprise's affairs "through" racketeering. In *In re Insurance Brokerage Antitrust Litigation*, we said that relationship exists if a defendant "participated in the conduct of the enterprise's affairs . . . through—that is 'by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of'—a pattern of racketeering activity." 618 F.3d at 372 (quoting *United States v. Brandao*, 539 F.3d 44, 53 (1st Cir. 2008)).

Here, the District Court properly instructed the jury that "the government must demonstrate that Joseph Ferriero conducted or participated in the conduct of the affairs of the enterprise by means of, by consequence of, by reason of, by agency of, or by the instrumentality of a pattern of racketeering activity." The relevant "enterprise" was the Bergen County Democratic Organization. Its "affairs" include any matters and concerns that constituted party business.[8] And the jury concluded the C3 scheme amounted

---

[8] *See* 1 *Webster's Third New International Dictionary* 35 (1961) (defining "affairs" as "commercial, professional, or public business"); *Black's Law Dictionary* 79 (4th ed. 1968)

17

to a pattern of bribery.  Therefore, the question is whether a rational juror could conclude the C3 bribery scheme was one means by which Ferriero participated in the conduct of party business.

The record contains more than enough evidence for a rational juror to conclude that it was.  A rational juror could conclude it was party business when Ferriero recommended vendors to party members holding local office.  As the District Court observed, multiple witnesses testified Ferriero regularly recommended vendors to local Democratic officials.[9]  In fact, the BCDO hosted an annual gala at the municipal convention where local officials came to find vendors and providers of professional services.  And, as party chair, Ferriero's recommendations carried great weight.  A rational juror could conclude that when Ferriero made certain recommendations to local Democratic officials (regarding vendors or otherwise), it was party business by virtue of the considerable influence he held over those officials' reelection

(defining "affairs" as "[a]n inclusive term, bringing within its scope and meaning anything that a person may do").

[9] For example, Mayor Sarlo (Wood-Ridge) testified Ferriero regularly advised him about vendors.  Mayor McHale (Dumont) testified Ferriero would advise him on hiring professional service providers and make particular recommendations when the town had particular needs.  Ferriero recommended C3 to Mayor D'Arminio (Saddle Brook) at the same municipal conference where, several years earlier, Ferriero had recommended the engineering company Saddle Brook hired when D'Arminio first assumed the office of mayor.

and career prospects. Indeed, Ferriero's list of target officials and towns in Bergen County was almost entirely composed of Democratic officials and towns controlled by Democrats. A rational juror could conclude Ferriero conducted party business and the C3 bribery scheme in tandem when he carried out the scheme by recommending C3 to local Democratic officials and using his influence to urge that they award C3 contracts. A rational juror could therefore conclude the pattern of bribery was one means by which Ferriero participated in the conduct of the BCDO's affairs.

Ferriero asserts a rational juror could not reach that conclusion, and offers two arguments. We find neither persuasive. First, he argues the evidence was insufficient because it did not show he recommended C3 while performing an official BCDO duty or while acting in his capacity as party chairman. But a rational juror could have found that the BCDO's affairs went beyond the chair's official duties. As noted, the BCDO's affairs included those matters and concerns that comprised party business, and a rational juror could have concluded that party business included recommendations to party members in local office, in particular recommendations about hiring vendors. Ferriero need not have carried out the bribery scheme in an official capacity for a rational juror to conclude it was a means by which he participated in the conduct of the party's affairs.

Ferriero also argues that participating in the conduct of an enterprise's affairs by means of racketeering categorically excludes cases in which a defendant's association with the enterprise facilitates his predicate acts. Ferriero affirmatively agreed to the nexus instruction charged to the jury and takes

no issue with it on appeal.[10]  He nonetheless asserts that, because there was evidence he used his BCDO position to facilitate his bribery scheme, the record lacks evidence that bribery was a means by which he participated in the conduct of the BCDO's affairs.  As noted, there was more than enough evidence for a rational juror to conclude bribery was a means by which Ferriero participated in the conduct of the BCDO's affairs.  And in any event, his understanding of the nexus element is incorrect.

_____

[10] The government suggests Ferriero's nexus argument necessarily embeds a jury-instruction challenge into a sufficiency-of-the-evidence attack, and urges us to reject his argument as invited error or alternatively to review it for plain error, because Ferriero's attorney played an affirmative role in formulating the instruction.  Appellee Br. at 33.  If a defendant specifically requested an instruction, then he invited any alleged error in it and waived the right to argue it was flawed on appeal.  *See United States v. Andrews*, 681 F.3d 509, 517 n.4 (3d Cir. 2012).  But if he acquiesced to an instruction, then he forfeited (rather than waived) the argument and we may correct the error if it was "plain error . . . affecting substantial rights."  Fed. R. Crim. P. 52(b); *see United States v. Lawrence*, 662 F.3d 551, 557 (D.C. Cir. 2011) (reviewing for plain error where a defendant "acquiesced [to a jury instruction] . . . but he did not invite it" (citation and quotation marks omitted)); *see also United States v. Olano*, 507 U.S. 725, 733 (1993) (distinguishing waiver from forfeiture).  Assuming plain error review is appropriate, there was no error in the instruction, much less plain error, because Ferriero's nexus interpretation is incorrect.

20

Ferriero's flawed understanding stems from his misreading of a footnote in *Insurance Brokerage* that said it would "invert[] the relationship specified by § 1962(c)," 618 F.3d at 372 n.69, for the nexus inquiry to ask whether "the defendant was able to commit the predicate acts by means of . . . his association with the enterprise," *id.* (quoting *Brandao*, 539 F.3d at 53). Ferriero mistakenly reads our explanation to mean that in those circumstances—that is, when a defendant is able to commit racketeering by means of his association with an enterprise—it can never satisfy the required relationship between racketeering and the enterprise's affairs.

That reading puts more weight on the word "invert" than it can bear, and it ignores *Insurance Brokerage*'s relevant holding. The *Insurance Brokerage* test asks whether racketeering was a means of conducting the enterprise's affairs, but it does not foreclose satisfying the nexus when a defendant's position also enabled or facilitated the racketeering. In fact, those two situations may well overlap. For example, a crime boss can "[be] able to commit [murder] by means of . . . his association with [his crime syndicate]," *see Brandao*, 539 F.3d at 53, and simultaneously "participate[] in the conduct of [his crime syndicate's] affairs . . . by means of . . . a pattern of [murder]," *see Ins. Brokerage*, 618 F.3d at 372. We did not, in a footnote, transform § 1962(c)'s application by ruling out an entire category of cases that otherwise fall comfortably within the statute. The statute examines the relationship between the racketeering and the enterprise's affairs. But the relationship between the racketeering and the defendant's association with the enterprise may be relevant—and indeed sufficient—to satisfy the required relationship between the racketeering and the enterprise's affairs.

21

That much is clear from *Insurance Brokerage*'s relevant holding. There, in a case that evaluated a civil RICO complaint at the pleading stage,[11] we concluded that § 1962(c)'s nexus was not satisfied by allegations defendants simply used an opportunity provided by a legitimate enterprise—there, an industry group—to plot, discuss, or otherwise facilitate predicate acts. *Id.* at 380–81. But we said that if defendants "actually utilized [the industry group's] institutional machinery to formulate strategy and issue public statements in aid of their [alleged racketeering acts]," *id.* at 381, it would plausibly imply the pattern of racketeering was "one way they operated the enterprise," *id.* at 381–82. The allegations we determined could satisfy pleading plaintiffs' nexus element contradict Ferriero's nexus interpretation.

Ferriero's interpretation would also contradict familiar RICO examples and prior Third Circuit cases in which a public official's position facilitated predicate racketeering acts.[12] Ferriero's reading would likewise run counter to the

---

[11] *Insurance Brokerage* involved civil RICO claims, and though the burden of proof differs in civil and criminal RICO actions, the requisite nexus showing does not. *See United States v. Parise*, 159 F.3d 790, 796 & n.5 (3d Cir. 1998).

[12] *See, e.g.*, *United States v. Gillock*, 445 U.S. 360, 362 (1980) (state senator's office); *United States v. McDade*, 28 F.3d 283, 287 (3d Cir. 1994) (U.S. Congressman's office, office employees, and committee staff); *United States v. Woods*, 915 F.2d 854, 855–56 (3d Cir. 1990) (City Council of Pittsburgh); *United States v. Bacheler*, 611 F.2d 443, 450 (3d Cir.1979) (Philadelphia Traffic Court); *United States v.*

Supreme Court's explanation that "RICO . . . protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.'" *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) (quoting *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994)) (second alteration in original). Several other circuit opinions apply standards that satisfy § 1962(c)'s nexus if the enterprise facilitates racketeering.[13] And Ferriero's reading

---

*Frumento*, 563 F.2d 1083, 1089–90 (3d Cir. 1977) (Pennsylvania Bureau of Cigarette and Beverage Taxes).

[13] *See, e.g.*, *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 691 (2017) ("[P]redicate acts must be . . . related to the enterprise . . . [such] that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise." (citation and quotation marks omitted)); *United States v. Ramirez-Rivera*, 800 F.3d 1, 21 (1st Cir. 2015), *cert. denied*, 136 S. Ct. 908 (2016) ("It suffices that the defendant was able to commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of his association with the enterprise." (citation and quotation marks omitted)); *Akin v. Q-L Investments, Inc.*, 959 F.2d 521, 533–34 (5th Cir. 1992) ("[The] nexus is established by proof that the defendant has in fact committed the racketeering acts alleged, that the defendant's association with the enterprise facilitated the commission of the acts, and that the acts had some effect on the enterprise."); *United States v. Pieper*, 854 F.2d 1020, 1026 (7th Cir. 1988) ("To establish the nexus required by § 1962(c) between the racketeering activity and the affairs of

23

makes little sense given precedent elsewhere that predicate acts need not benefit the enterprise.[14]

We reiterate *Insurance Brokerage*'s statement that racketeering must be one means by which the defendant participates in the conduct of the enterprise's affairs. As noted, we believe there was sufficient evidence for a rational juror to conclude Ferriero participated in the conduct of the BCDO's affairs by means of a pattern of bribery. We will affirm Ferriero's RICO conviction on grounds that the evidence was sufficient to support the conviction's nexus element.

**3.**

Ferriero's final sufficiency challenge contests his wire fraud conviction. A person violates the federal wire fraud statute by using interstate wires to execute "any scheme or

_____

the enterprise, . . . the government must show that: (1) the defendant committed the racketeering acts, (2) the defendant's position in or relation with the enterprise facilitated commission of the acts, and (3) the acts had 'some effect' on the enterprise."); *see also United States v. Grubb*, 11 F.3d 426, 439–40 (4th Cir. 1993) (stating it satisfied the nexus element when a judge "physically used his judicial office . . . [and] the prestige and power of the office itself" to commit racketeering).

[14] *See, e.g.*, *United States v. Godwin*, 765 F.3d 1306, 1320–21 (11th Cir. 2014); *United States v. Bruno*, 383 F.3d 65, 84 (2d Cir. 2004); *Grubb*, 11 F.3d at 439; *United States v. Welch*, 656 F.2d 1039, 1061–62 (5th Cir. Unit A 1981).

artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. The jury found Ferriero guilty of wire fraud based on Carrino's July 9, 2008, email to Cliffside Park CFO Frank Berardo. The jury concluded that Carrino's email to Berardo "intentionally fail[ed] to disclose Joseph Ferriero's financial interest in C3's contract with the borough of Cliffside Park." The jury concluded Carrino's email amounted to executing "a scheme or artifice to defraud the borough of Cliffside Park and to obtain money from the borough of Cliffside Park by means of materially false and fraudulent pretenses, representations, and promises." *Id.* The issue then is whether the evidence was sufficient for a rational juror to conclude Carrino's failure to disclose Ferriero's C3 interest amounted to a materially false or fraudulent misrepresentation.

Assessing whether a communication is fraudulent, truthful, or otherwise is a highly contextual inquiry. *See United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978) (observing that in the inquiry into "whether [a scheme] [i]s fraudulent in nature, there are no hard and fast rules of law to apply"); *see also Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016) (concluding disputed claims, though technically true, "were clearly misleading in context"). Express falsehoods lie at fraud's core, but a fraudulent representation "need not be fraudulent on its face," *Pearlstein*, 576 F.2d at 535, nor must it necessarily "involve affirmative misrepresentation," *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991). Rather, a fraudulent or false representation "may be effected by deceitful statements of half-truths or the concealment of material facts." *United States v. Bryant*, 655

25

F.3d 232, 249 (3d Cir. 2011) (quoting *United States v. Olatunji*, 872 F.2d 1161, 1167 (3d Cir. 1989)).

In *Universal Health Services v. United States ex rel. Escobar*, the Supreme Court discussed the gray area "half-truths" occupy in the context of fraud. *See* 136 S. Ct. at 2000. In *Escobar*, the defendant health care provider submitted Medicaid reimbursement claims without disclosing that the underlying care did not comply with relevant regulations. *Id.* at 1997–98. The issue was whether the submissions amounted to "false or fraudulent claims" within the meaning of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). *Id.* at 1995–96. The government invoked the common-law rule "that, while nondisclosure alone ordinarily is not actionable, '[a] representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter' is actionable." *Id.* at 1999 (quoting Restatement (Second) of Torts § 529 (1976)). Defendant Universal Health invoked a different common-law maxim, similar to Ferriero's contention here: "nondisclosure of legal violations is not actionable absent a special 'duty . . . to exercise reasonable care to disclose the matter in question.'" *Id.* at 2000 (quoting Restatement (Second) of Torts § 551(1)) (alteration in original).

The Court resolved the claims "[fell] squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations."[15] *Id.*

---

[15] By way of illustration, the *Escobar* Court gave several examples of half-truths actionable as misrepresentations. 136 S.Ct. at 2000. A "classic example" from contract law is "the

(footnote omitted). The claims were "clearly misleading in context," because anyone reading them "would probably—but wrongly—conclude the clinic had complied with" the underlying regulations. *Id.*

Here, Ferriero asserts the evidence was insufficient to prove wire fraud because Berardo asked only who *owned* the corporation, and no more. Ferriero contends the failure to disclose his involvement was a mere omission, which does not constitute a false representation unless a party has a duty of disclosure based on "a fiduciary or similar special relationship." Appellant Br. at 39.

Ferriero primarily relies on our opinion in *Kehr Packages, Inc. v. Fidelcor*, which involved a civil RICO claim for which the predicate acts were alleged mail fraud. 926 F.2d at 1408. In a leveraged buyout, the purchasers alleged bankers from the deal's financier, Fidelity Bank, promised a credit line the bankers never actually intended to secure. *Id.* at 1410. When Kehr ultimately fell short on working capital, those bankers had left Fidelity. *Id.* The loan had been transferred to Thomas Donnelly, a vice-president who Kehr believed had authority to secure the credit line, but

seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property." *Id.* (citing *Junius Constr. Co. v. Cohen*, 178 N.E. 672, 674 (N.Y. 1931) (Cardozo, J.)). Another example would be a job applicant at a local college listing "retirement" after previous jobs, without disclosing "retirement" was a prison stint for bank fraud. *Id.* (citing 3 Dan B. Dobbs et al., *The Law of Torts* § 682, pp. 702–03 & n. 14 (2d ed. 2011)).

who was actually in charge of protecting Fidelity's interest in the collateral for the initial loan. *Id.* Kehr's management repeatedly asked Donnelly about the line of credit, to which he responded that he would review the matter and that Kehr should draft a "plan of attack" demonstrating how its financial situation could be improved. *Id.* Kehr eventually ran out of working capital, at which point Donnelly revealed he was actually with the asset-recovery group, mailed Kehr a notice of default, and confessed judgment against the loan collateral. *Id.* at 1410–11. The relevant issue was whether Donnelly's alleged actions amounted to fraud. *Id.* at 1416.

Relevant here, the *Kehr* plaintiffs alleged Donnelly committed fraud when he failed to disclose he worked in Fidelity's asset-recovery group and lacked lending authority. *Id.* We concluded that "none of Donnelly's alleged acts or omissions could be 'reasonably calculated to deceive a person of ordinary prudence and comprehension.'" *Id.* (quoting *Pearlstein*, 576 F.2d at 535). The non-disclosure of Donnelly's job title, without more, could not amount to fraud. *Id.* Donnelly never actually represented that he had lending authority or that he would secure the funds. *Id.* His non-disclosure could not "reasonably be said to be deceptive" and there was therefore "no deceit []or fraud within the meaning of the mail fraud statute." *Id.*

Ferriero likens himself and Carrino to Donnelly, and contends the non-disclosure of Ferriero's C3 interest cannot amount to deceit or fraud absent a "fiduciary-like duty to the representatives or the people of Cliffside Park." Appellant Br. at 39. Some cases have required a fiduciary or other duty to impose liability for non-disclosure, but those cases have generally involved contexts where defendants made no actual

28

representation and instead faced potential liability for simply staying silent.[16] Here, there was an actual representation—Carrino's email of July 9, 2008—and the issue is whether there was sufficient evidence for a rational juror to conclude the representation, in context, was materially false and fraudulent.

We conclude there was. The evidence showed Cliffside Park's leadership had concerns about the C3 contract and "who was involved with C3 Communications." The morning of July 9, 2008, Cliffside Park CFO Frank Berardo called Carrino to "find out, number one, where is the

---

[16] For example, in *Chiarella v. United States*, 445 U.S. 222 (1980), a securities fraud case, the Supreme Court confronted the "legal effect of [a defendant's] silence," *id.* at 226, relating to a stock transaction in which the defendant had deduced the existence of a corporate takeover by virtue of his work at the financial printer that drew up takeover-bid announcements, *id.* at 224. "[S]ilence in connection with the purchase or sale of securities may operate as fraud . . . [if there exists] a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Id.* at 230. Corporate insiders have a fiduciary obligation to shareholders, and even "tippees" of inside information have an obligation to disclose arising from their participation in the insider's fiduciary breach. *Id.* at 230 & n.12. But the print employee—who was "a complete stranger"—lacked any role as agent, fiduciary, or occupant of a position of company trust or confidence. *Id.* at 232–33. Therefore, his nondisclosure of information—that is, his "silence" during the securities transaction—could not be the basis of fraud liability. *Id.* at 235.

contract, and who are the owners of this corporation." Even though Carrino was the corporation's sole owner, he did not answer Berardo's questions, and replied he would answer with an email instead. When he sent that email, the attached C3 certificate of formation listed John Carrino as the corporation's only member or managing member. A rational juror could have concluded that the email, in context, held out to Cliffside Park officials that Carrino was the only individual who stood to profit from Cliffside Park's C3 contract. A rational juror could have concluded the email, while true "so far as it goes[,]    . . . omitt[ed] critical qualifying information"—namely, information that Ferriero was entitled to 25 percent of C3's Cliffside Park profits. *See Escobar*, 136 S. Ct. at 2000.

Whether a representation is false or fraudulent is a contextual inquiry, *see Pearlstein*, 576 F.2d at 535, that a jury is particularly well-suited to assess. Here, the jury heard testimony from the parties involved and concluded the omission in Carrino's email amounted to a materially false and fraudulent pretense or representation. We cannot say there was insufficient evidence for a rational juror to reach that conclusion.

## B.

In his second set of challenges, Ferriero levels several attacks—statutory and constitutional—against the validity of his convictions based on violations of New Jersey's bribery statute.

## 1.

30

Ferriero's first challenge posits Congress did not intend political party officials to fall in the category of individuals punishable for bribery as a RICO or Travel Act predicate.[17]

On this point, Ferriero relies primarily on *Perrin v. United States*, 444 U.S. 37 (1979). There, the Supreme Court held the language "bribery . . . in violation of the laws of the State in which committed" that appears in the Travel Act, 18 U.S.C. § 1952, includes commercial bribery laws and not just common-law bribery limited to public officials, *Perrin*, 444 U.S. at 50. The *Perrin* petitioners were charged with violating the Travel Act by using interstate facilities to promote a commercial bribery scheme proscribed by Louisiana law. *Id.* at 38–39. They maintained the Travel Act's use of "bribery" was confined to the common-law

---

[17] Ferriero did not raise this issue before the District Court. On appeal, Ferriero concedes the issue faces plain-error review. The government states the issue at least faces plain-error review, but also suggests Ferriero waived the argument based on Federal Rule of Criminal Procedure 12, which addresses claims the indictment fails to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v), (c)(3). We have not decided the standard of review for Rule 12(b)(3) claims raised for the first time on appeal, but courts of appeal that have applied the rule have employed plain-error review. *See United States v. Soto*, 794 F.3d 635, 652, 655 (6th Cir. 2015); *United States v. Sperrazza*, 804 F.3d 1113, 1121 (11th Cir. 2015). Because the parties did not brief the issue and because Ferriero's argument fails under any standard we might apply, we need not address the standard of review for Rule 12(b)(3) claims raised for the first time on appeal.

definition punishing only bribery of public officials, and asserted their conduct was therefore not chargeable as a federal offense. *Id.* at 41.

The Supreme Court rejected that argument and instead concluded Congress intended a broader understanding of bribery, which by 1961—the year of the Travel Act's passage—extended beyond the crime's common-law definition. *Id.* at 45. The Court observed that at early common law, bribery extended only to the corruption of judges, but by the nineteenth century had "expanded to include the corruption of any public official and the bribery of voters and witnesses as well." *Id.* at 43 (citing James F. Stephen, *Digest of the Criminal Law* 85–87 (1877)). By the time Congress passed the Travel Act, fourteen states had enacted commercial bribery laws. *Id.* at 44. And it was by then commonplace for states to punish bribes paid to or received by private individuals in more specific capacities, including "agents, common carrier and telegraph company employees, labor officials, bank employees, and participants in sporting events." *Id.*; *see also id.* at 44 & n.10 (listing examples of state private-sphere bribery provisions).

Even though "bribery" as used in RICO and the Travel Act clearly covers bribery of myriad private and public persons, *see id.*, Ferriero claims it cannot cover bribery of political party officials. He asserts that at the time of those laws' passage, statutes punishing bribery of party officials were not sufficiently widespread to have been incorporated into "bribery" for the two federal statutes' purposes. He relies on *Perrin* for the proposition that both statutes therefore exclude party officials from federal punishment.

32

We disagree. On our reading of *Perrin*, the Travel Act and RICO incorporate a definition of bribery broad enough to encompass bribes paid to or accepted by political party officials. As *Perrin* pointed out, bribery laws already applied to judges, public officials, voters, and witnesses as far back as the nineteenth century. 444 U.S. at 43. If bribery within the meaning of the Travel Act (and necessarily RICO) is broad enough to likewise include commercial employees, agents, labor officials, bank employees, and sporting-event participants, *id.* at 43–44, then the term is also broad enough to include political party officials. Indeed, bribery's generic understanding as explained in *Perrin* reasonably includes "all relations which are recognized in a society as involving special trust [that] should be kept secure from the corrupting influence of bribery." *Id.* at 45 (quoting Am. Law Inst., Model Penal Code § 223.10, pp. 113–17, Comments (Tent. Draft No. 11, 1960)). We understand *Perrin*'s explanation of bribery as extending to party officials who, like numerous other private persons and public officials, occupy positions of "special trust." *Id.; see State v. Schenkolewski*, 693 A.2d 1173, 1185 (N.J. Super Ct. App. Div. 1997) (explaining that New Jersey's current bribery statute, like its predecessor, is intended to "proscribe conduct . . . which 'denigrates the integrity of our public institutions'" (quoting *State v. Ferro*, 320 A.2d 177, 180 (N.J. Super. Ct. App. Div. 1974))); *Ferro*, 320 A.2d at 181 (describing New Jersey's predecessor bribery scheme as "penaliz[ing] those in an apparent position of trust who would utilize their position or relationship to influence some governmental activity o[r] public official"). Therefore, we reject Ferriero's assertion that party officials generally—and him specifically—fall outside the ambit of either the Travel Act or RICO.

33

**2.**

Ferriero's final challenge asserts New Jersey's bribery statute is unconstitutionally vague and overbroad. Ferriero raised these arguments before the trial court, and our review is plenary. *United States v. Dees*, 467 F.3d 847, 853 (3d Cir. 2006).

A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *United States v. Amirnazmi*, 645 F.3d 564, 588 (3d Cir.2011) (internal quotation marks and citation omitted); *see Skilling v. United States*, 561 U.S. 358, 412 (2010). For the criminal context in particular, vagueness challenges "may be overcome in any specific case where reasonable persons would know their conduct puts them at risk of punishment under the statute." *United States v. Moyer*, 674 F.3d 192, 211 (2012) (citation, internal quotation marks, and alteration omitted); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). A criminal statute therefore "need only give 'fair warning' that certain conduct is prohibited." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (quoting *Colten v. Kentucky*, 407 U.S. 104 (1972)).

Ferriero contends the statute's vagueness arises from several terms. First, he maintains the statute is vague because it prohibits accepting "any benefit not authorized by law" as consideration for a vote, recommendation, decision, or exercise of discretion. N.J. Stat. Ann. § 2C:27–2. Ferriero

34

also takes issue with the phrase "on a public issue," *id.* § 2C:27–2(a), because that phrase remains undefined.

We find no constitutional infirmity in the bribery statute's level of specificity. By proscribing acceptance of "any benefit as consideration for *a* decision, opinion, recommendation, vote or exercise of discretion," *id.* (emphasis added), the statute clarifies that the benefit must be given in exchange for a "decision, opinion, recommendation, vote or exercise of discretion" in favor of a particular outcome. *See Schenkolewski*, 693 A.2d at 1185–86 (describing bribery scheme as paying money "in exchange for a 'promised' or 'definitive' vote" by municipal committee so as to "insure favorable action" on local development project); *see also MacDougall v. Weichert*, 677 A.2d 162, 181 (N.J. 1996) (Wilentz, C.J., dissenting) (explaining the core of the bribery statute as special interests paying "a public official to control his vote"). The definition "any benefit not authorized by law" narrows the statute further. For example, New Jersey election law provides that county political party committees may receive and disburse funds in order to maintain their party organization, including for the purposes of hiring staff and publicizing candidates and party organizations. *See* N.J. Stat. Ann. § 19:5–5. We read New Jersey's bribery statute as sufficiently clear to give party chairs "a reasonable opportunity to understand," *Amirnazmi*, 645 F.3d at 588, they may not accept payments from vendors in exchange for urging party members in local decisionmaking bodies to buy those same vendors' products.

Ferriero also asserts the bribery statute is overbroad. "In the First Amendment context, . . . a law may be invalidated as overbroad if 'a substantial number of its

35

applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

We can find no applications (much less a substantial number) of the bribery law that are unconstitutional. To be sure, bribery laws occupy territory ancillary to the First Amendment rights to associate and to petition the government. *See Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) ("It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments."); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–37 (1961) (implying that lobbying implicates First Amendment petition rights). But New Jersey's bribery law does not punish legitimate First Amendment activity. It punishes corrupt agreements in which party officials accept payment in exchange for making a particular decision or recommendation, expressing a particular opinion, or voting a particular way. *See* N.J. Stat. Ann. § 2C:27–2 (covering benefits exchanged in consideration for "a decision, opinion, recommendation, vote or exercise of discretion"). Such corrupt agreements do not enjoy First Amendment protection. *United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protections."). New Jersey's bribery statute only punishes party officials' corrupt bargains, not their exercise of associational or petition rights. We do not think the application of New Jersey's bribery statute in this case was unconstitutionally vague.

36

## C.

After Ferriero filed his opening brief with this Court, the Supreme Court decided *McDonnell v. United States*, 136 S.Ct. 2355 (2015), in which the Court interpreted the federal bribery statute, 18 U.S.C. § 201, and clarified that provision's definition of the term "official act." In a supplemental brief, Ferriero contends *McDonnell* weighs in favor of his statutory and constitutional arguments. On our reading of *McDonnell*, however, we find nothing in that opinion that changes the outcome of this case.

*McDonnell* involved a public-corruption case against former Virginia Governor Robert McDonnell. 136 S.Ct. at 2361. The case stemmed from McDonnell's relationship with Jonnie Williams, a Virginia businessman who sought state universities' help in researching health benefits of a tobacco-based supplement his company developed. *Id.* at 2362. From 2009 to 2012, McDonnell accepted more than $175,000 from Williams in the form of payments, loans, and gifts. *Id.* at 2362–64. During that same period, McDonnell helped Williams in numerous ways, including events McDonnell hosted and meetings he arranged with state officials.[18] *Id.*

---

[18] In particular, McDonnell introduced Williams to Dr. William Hazel, Virginia's Secretary of Health and Human Resources; he sent Dr. Hazel proposed research protocol for studies on Williams's supplement; and he arranged a meeting for Williams with Dr. Hazel's aide. *Id.* at 2362–63. McDonnell also hosted a lunch event for Williams's company at the Governor's Mansion with a guest list that included researchers from state universities. *Id.* at 2363. And at a meeting with Virginia officials responsible for the state-

A jury convicted McDonnell of committing honest services fraud and Hobbs Act extortion.[19]  *Id.* at 2364–65. Those charges reflected an underlying theory that Williams's payments in exchange for McDonnell's actions constituted bribery.[20]  *Id.* at 2365.  The parties agreed to define terms within those charges by reference to the federal bribery statute, 18 U.S.C. § 201.  *Id.*  As a result, both charges required the government to prove McDonnell accepted Williams's loans, payments, and gifts in exchange for committing, or agreeing to commit, an "official act" within the meaning of § 201.  *Id.*  The government alleged

---

employee health plan, McDonnell, who took the supplement himself, told the officials the pills "'were working well for him' and 'would be good for' state employees."  *Id.* at 2364.

[19] The indictment charged McDonnell with conspiracy to commit honest services fraud, substantive charges of honest services fraud, conspiracy to commit Hobbs Act extortion, substantive Hobbs Act extortion, and making a false statement.  *Id.* at 2365; *see* 18 U.S.C. §§ 1343, 1349 (honest services fraud); *id.* § 1951(a) (Hobbs Act extortion); *id.* § 1014 (false statement).  The jury acquitted him of the false statement charge.  *McDonnell*, 136 S.Ct. at 2366.

[20] The Supreme Court has construed the honest services fraud statute as prohibiting "fraudulent schemes to deprive another of honest services through bribes or kickbacks."  *McDonnell*, 136 S.Ct. at 2365 (quoting *Skilling v. United States*, 561 U.S. 358, 404 (2010)). The Hobbs Act proscribes obtaining the property of another "under color of official right," 18 U.S.C. § 1951(b)(2), which includes a "public official . . . 'taking a bribe,'" *Evans v. United States*, 504 U.S. 255, 260 (1992).

McDonnell had committed at least five "official acts," which included arranging meetings, hosting events, and recommending Williams's supplement to Virginia state officials. *Id.* at 2365–66.

The issue in *McDonnell* arose from the jury instructions' explanation of the term "official act." *Id.* at 2367. McDonnell had unsuccessfully requested that the court qualify its instruction on "official act" by limiting that term to actions and decisions on matters actually pending before the state government.[21] *Id.* The District Court declined to include McDonnell's requested qualification. *Id.* Instead, the court followed the government's proposed instruction, which advised the jury that "official act" encompassed "'acts that a public official customarily performs,' including acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'" *Id.* at 2366. Based on those instructions, the jury convicted McDonnell, and the Court of Appeals for the Fourth Circuit affirmed. *Id.*

The Supreme Court vacated McDonnell's convictions, *id.* at 2375, holding that "[s]etting up a meeting, talking to

---

[21] Specifically, McDonnell had asked the trial court to explain that "routine activity," such as "arranging a meeting" or "hosting a reception," cannot alone amount to an official act, because such routine acts "are not decisions on matters pending before the government." *McDonnell*, 136 S.Ct. at 2366 (quoting *United States v. McDonnell*, 792 F.3d 478, 513 (4th Cir. 2015)). He had also requested the court instruct the jury that an official act requires an officeholder intend to "influence a specific official decision the government actually makes." *Id.* (internal quotation marks and citation omitted).

another official, or organizing an event (or agreeing to do so)—without more—does not [constitute] . . . an 'official act,'" *id.* at 2372. In doing so, the Court rejected the broad definition of "official act" that the government proposed, which would encompass "nearly any activity by a public official." *Id.* at 2367.

The bulk of that holding rested on the Court's interpretation of § 201. *See id.* at 2367–72. Section 201 defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). Relying on traditional tools of statutory interpretation, the Court determined that "a typical meeting, call, or event . . . does not qualify as a 'question' or 'matter' under § 201(a)(3)." *McDonnell*, 136 S.Ct. at 2369. More concrete governmental decisions could qualify as a pending question or matter—namely, state officials' decisions to study the supplement, to allocate grant money for such studies, or to cover the supplement in state-employee health insurance plans. *Id.* at 2370. But for an "event, meeting, or speech . . . related to a pending question or matter" to be an actual "decision or action" on that pending question or matter, § 201 requires "something more"—that is, something like initiating an actual study or pressuring another official to commit an official act.[22] *Id.*

---

[22] According to the Court, "something more" could be a decision or action "to initiate a research study—or . . . [to] narrow[] down the list of potential research topics." *Id.* at 2370. It would also qualify if a public office "use[d] his

40

The Court reinforced its interpretive conclusion by invoking several constitutional concerns that the government's broad definition of "official act" would implicate. First, the government's definition could chill interactions between public officials and their constituents that are normal in a democracy. *See id.* at 2372. "[C]onscientious public officials arrange meetings for constituents, contact other public officials on their behalf, and include them in events all the time," *id.*, and too broad a definition of "official act" might dissuade constituents from making campaign contributions or from conducting normal activities like inviting officials "on their annual outing to the ballgame," *id.* The Court feared "citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.*

Second, a definition that encompassed "nearly any activity by a public official," *id.* at 2367, raised due process concerns of vagueness, *id.* at 2373; *see id.* ("Under the 'standardless sweep' of the Government's reading, public officials could be subject to prosecution, without fair notice, for the most prosaic interactions." (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983))). And finally, "significant federalism concerns" weighed against a broad interpretation of a federal statute that governed state and local officials' conduct. *Id.*; *see id.* ("[W]e decline to 'construe the

---

official position to exert pressure on *another* official to perform an 'official act' . . . [or] use[d] his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.*

41

statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials.'" (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987))). These constitutional concerns supported the Court's decision to reject the government's broad definition in favor of a "more constrained interpretation." *Id.*

Nothing in *McDonnell* changes the outcome for Ferriero in this case. Ferriero contends "*McDonnell* reinforces [his] statutory construction arguments." Appellant Supp. Br. at 5. He analogizes the phrase "on a public issue," N.J. Stat. Ann. § 2C:27–2, and "official act," 18 U.S.C. § 201(a)(3), to seemingly argue that "on a public issue" should limit the bribery provision to pending agenda items before a town council. First, *McDonnell*'s "more constrained," 136 S.Ct. at 2373, construction of "official act" was primarily a product of the Court's interpretive analysis of that particular statute and the expansive jury instructions given by the District Court. Although the statutes in *McDonnell* and here both involve bribery, we see no reason for transplanting the conclusions in *McDonnell* that stem solely from the Court's application of general statutory-construction principles to the particular statute at issue in that case.

As for the Court's admonitions of the "significant constitutional concerns," *id.* at 2372, raised by the government's position in *McDonnell*, those concerns do not exist here. New Jersey's bribery statute is narrower than the broad interpretation of "official act" the *McDonnell* Court

42

rejected.[23]  That broad interpretation would have encompassed "nearly any activity by a public official." *Id.* at 2367. New Jersey's statute requires the paid-for decision, opinion, recommendation, vote, or exercise of discretion be on a public issue or in a public election. *See* N.J. Stat. Ann. § 2C:27–2(a). Likewise, we read the New Jersey provision as proscribing bribes paid in exchange for party officials deciding or voting a certain way, giving a particular opinion or recommendation, or exercising discretion in favor of a particular outcome. *See* Part III.B.1, *supra*. We do not think New Jersey's citizens will "shrink from participating in democratic discourse," *McDonnell*, 136 S.Ct. at 2372, because the state's bribery law prohibits quid-pro-quo arrangements in which money is paid "in exchange for a 'promised' or 'definitive,'" *Schenkolewski*, 693 A.2d at 1185–86, decision, opinion, recommendation, or vote.

The other constitutional concerns in *McDonnell* involved vagueness and matters of federalism. 136 S.Ct. at 2373. As noted, we do not believe New Jersey's bribery statute is unconstitutionally vague, *see* Part III.B.2, *supra*, nor does it involve the concerns about vagueness presented by the government's position in *McDonnell*. And this case lacks the federalism concerns present in *McDonnell*. *McDonnell* involved a congressionally written standard that governed the conduct of state officials. Though this case applies a federal statute to a nonfederal, local party official, it applies a

_____

[23] As noted, that statute prohibits "accept[ing] or agree[ing] to accept . . . [a]ny benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election." N.J. Stat. Ann. § 2C:27–2.

43

standard from a New Jersey statute written by New Jersey legislators. It simply does not "'involve[] the Federal Government in setting standards' of 'good government for local and state officials.'" *McDonnell*, 136 S.Ct. at 2373 (quoting *McNally*, 483 U.S. at 360).

## IV.

For the foregoing reasons, we will affirm Ferriero's judgments of conviction, forfeiture, and sentence.